No. 17-55180

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

KRISTEN BIEL,

      Plaintiff/Appellant,

v.

ST. JAMES SCHOOL, a Corp.,

      Defendant/Appellee.

_____

On Appeal from the United States District Court
for the Central District of California
Civ. Action No. 2:15-cv-4248
Hon. Terry J. Hatter, Senior District Judge

_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF/APPELLANT AND FOR REVERSAL

_____

JAMES L. LEE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

BARBARA L. SLOAN
Acting Assistant General Counsel

SUSAN R. OXFORD
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4791
susan.oxford@eeoc.gov

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

STATEMENT OF INTEREST ...................................................................1

STATEMENT OF THE ISSUE ..................................................................2

STATEMENT OF THE CASE ...................................................................2

    A.  Statement of the Facts...................................................................2

    B.  District Court's Decision ..............................................................6

ARGUMENT ............................................................................................8

The district court erred in ruling that Biel, as a fifth-grade teacher in a
Catholic school, was a "minister" of the Catholic church and, as such,
barred by the ministerial exception from pursuing her disability discrimination
claims against the school. ........................................................................8

CONCLUSION ........................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................28

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                                           <u>page</u>

*Alcazar v. Corp. of the Catholic Archbishop of Seattle*,
 627 F.3d 1288 (9th Cir. 2010) (en banc) ........................................................12

*Bohnert v. Roman Catholic Archbishop of San Francisco*,
 136 F. Supp. 3d 1094 (N.D. Cal. 2015) ...........................................................25

*Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012) ..................24

*Dark v. Curry Cnty.*, 451 F.3d 1078 (9th Cir. 2006) .............................................10

*Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701 (D. Md. 2013) ...26

*EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) .......................8, 9

*EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980) ...........................8, 22, 23

*EEOC v. Pac. Press Publ'g*, 676 F.2d 1272 (9th Cir. 1982),
 *abrogated on other grounds as recognized by Am. Friends Serv.*
 *Comm. Corp. v. Thornburgh*, 951 F.2d 957 (9th Cir.1991) ..............................23

*Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) ...............................24

*Herx v. Diocese of Ft. Wayne-South Bend, Inc.*,
 48 F. Supp. 3d 1168 (N.D. Ind. 2014) ..............................................................25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 132 S. Ct. 694 (2012) .......................................................... 1, 7, 11, 12, *passim*

*Humphrey v. Mem. Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001) .........................10

*Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017) .....................................................17

*Redhead v. Conference of Seventh-Day Adventists*,
 440 F. Supp. 2d 211 (E.D.N.Y. 2006),
 *adhered to after reconsideration*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008) .........26

**Cases (cont'd)** page

*Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132 (D. Ore. 2017) ...........23

*Sterlinski v. Catholic Bishop of Chic.*,
  2017 WL 1550186 (N.D. Ill. May 1, 2017) ................................24, 25

*Werft v. Desert Sw. Annual Conference of United Methodist Church*,
  377 F.3d 1099 (9th Cir. 2004) .............................8

**Constitutional Provisions**

The First Amendment ...................................8, 11, 12

**Statutes**

42 U.S.C. § 2000e-1(a) ................................9

42 U.S.C. § 2000e-2(e)(2) .............................9

42 U.S.C. §§ 2000e-4, 2000e-5................................1

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* ...................1

42 U.S.C. § 12101(b) .................................1

42 U.S.C. § 12111(1) ................................1

42 U.S.C. § 12111(5)(B) ...............................9

42 U.S.C. § 12112(a) ................................9

42 U.S.C. § 12117(a) ................................1

**Court Rules**

Fed. R. App. P. 29(a) ................................1

iii

## **STATEMENT OF INTEREST**

Congress charged the Equal Employment Opportunity Commission (EEOC or Commission) with enforcing the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and other federal laws that prohibit employment discrimination. *See* 42 U.S.C. §§ 12101(b), 12111(1), 12117(a); *see also, e.g.*, 42 U.S.C. §§ 2000e-4, 2000e-5 (Title VII of the Civil Rights Act of 1964). The plaintiff here—a former fifth-grade teacher in a Catholic school—alleges the school discriminated against her on the basis of disability when it failed to renew her annual teaching contract a few weeks after she told the principal she had breast cancer. Without ever reaching her ADA claim, the district court dismissed the plaintiff's lawsuit, mistakenly concluding that she was a "minister" within the meaning of the ministerial exception, which exempts religious institutions from some employment discrimination claims. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). If affirmed, this misapplication of the ministerial exception not only would deprive this plaintiff of the ability to pursue her federal workplace rights, but also could undermine the ability of other individuals to challenge discrimination by a religious institution. Given the importance of clarifying the scope of the ministerial exception, the Commission offers its views to the Court. *See* Fed. R. App. P. 29(a).

## STATEMENT OF THE ISSUE[1]

Did the district court misapply the Supreme Court's totality-of-the-circumstances approach in *Hosanna-Tabor* when it granted the defendant parochial school summary judgment and dismissed the plaintiff's ADA claim on the ground that, as a fifth-grade teacher in this Catholic school, she was a "minister" and, accordingly, her discrimination claim fell within the ministerial exception?

## STATEMENT OF THE CASE

### A.   Statement of the Facts

Kristen Biel is a credentialed teacher with a Bachelor of Arts in liberal studies that she acquired after attending three secular colleges.  Excerpts of Record, Volume III (III-ER.) at 210-212.  Before accepting a position at St. James Catholic School, she worked as a substitute teacher at both public and private schools.  III-ER.212-214.  St. James is a Catholic elementary school in Torrance, California, that includes kindergarten through eighth grade, with one class per grade level.  III-ER.157-158; IV-ER.665.  The school describes itself as the parish school for St. James Catholic Church and identifies itself as part of that church's overall ministry.  III-ER.157; IV-ER.665.

In March 2013, the school hired Biel as a long-term substitute for a part-time first-grade teacher on maternity leave who had been job-sharing with another

---

[1] The Commission takes no position on any other issue in this appeal.

2

teacher. III-ER.215. The other first-grade teacher taught the class three days per week; Biel, as a long-term substitute, taught the class two days per week. III-ER.215-216. When this part-time position ended in June 2013, the school hired Biel to be its full-time fifth-grade teacher for the 2013-2014 school year. III-ER.217. The school presented Biel with a Faculty Employment Agreement that the church pastor, the school principal, and Biel all signed. III-ER.218-220, 277-281. The agreement—a form employment contract for elementary school teachers distributed by the Archdiocese of Los Angeles (IV-ER.665)—designated Biel as "Teacher" and identified the position she was accepting as "Grade 5 Teacher at St. James School." III-ER.277, 280.

Although Biel is Catholic, the school did not require its teaching staff to be Catholic as a condition of employment.[2] *See* III-ER.159, 277-281. The school's employment agreement did, however, require teachers to "model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church" and to "participate in … School liturgical activities, as requested." III-ER.277; IV-ER.666. In the 2013-2014 school year, the school required every teacher, including Biel, "to pray with their students every day." IV-ER.667; *see also* III-ER.161, 223. In Biel's classroom, students recited prayers they already knew,

---

[2] The school principal attested that it is her "preference that the teachers at St. James are practicing Catholics." IV-ER.666.

3

mostly led by designated student "prayer leaders." III-ER-223. The school also required Biel to accompany her students to Mass once a month, IV-ER.667, where her primary role was to keep students quiet and in their seats. III-ER.227-229.

As the school's only fifth-grade teacher, Biel taught her students all the standard fifth-grade academic subjects. She also taught religion to her students four days a week, for approximately thirty minutes per day, based on a workbook that the school's principal, Sister Mary Margaret, gave her to use. III-ER.224-227; IV-ER.666, 678-682. And, according to Sister Mary Margaret, every teacher was required "to develop, promote, and implement the Catholic faith through their daily teachings"; teacher evaluations assessed whether teachers were "infusing 'Catholic values through all subject areas.'" IV-ER.666-667. To that end, after Biel began working full-time at the school, Sister Mary Margaret required her and the other St. James teachers to attend a half-day (four- or five-hour) Religious Education Conference that Biel said consisted mostly of "education classes." III-ER.230-234; IV-ER.667. Biel recalled that although some of the classes covered "different techniques on teaching and incorporating God" into lesson plans, other classes covered non-religious topics such as art. III-ER.232-34.

Once the semester began, Sister Mary Margaret observed Biel's classroom teaching from time to time, as she did for all the school's teachers. *See* IV-ER.785. Based on these observations, Sister Mary Margaret periodically expressed

4

concerns about some of Biel's teaching practices. *See, e.g.*, III-ER.235-237; IV-ER.667-668, 784-796. Sister Mary Margaret conducted only one formal evaluation, however—in November 2013—and in the resulting written report, commented that it was a "good review." III-ER.283. The written evaluation noted, among other things, that Biel was "[u]sing instructional time to optimize learning"; "maintaining learning environments that are physically, intellectually, and emotionally safe"; and "[p]romoting critical thinking through inquiry, problem solving, and reflection." III-ER.282-283.

Biel was diagnosed with breast cancer during the school's Easter break in late April 2014, a diagnosis she shared with Sister Mary Margaret the following Monday. III-ER.258-259, 461. In early May, Biel told Sister Mary Margaret that she would need time off starting May 23, 2014, to prepare for cancer treatments scheduled to begin on May 27. III-ER.267 (Biel's "first chemo date was the 27th"; Biel and school principal jointly decided Biel's last day before starting her medical leave would be May 23).

The faculty employment contract obligates the school to inform teachers by May 15 of each year whether their contract will be renewed for the following school year. IV-ER.666. On May 15, 2014, Sister Mary Margaret prepared a letter advising Biel that she would not receive a contract for the following year and left the letter in Biel's faculty mailbox. III-ER.287, 469-471.

5

Biel never received the letter, and began her cancer treatments not knowing whether her contract would be renewed. III-ER.263. At some point, Biel asked to meet with the principal to discuss her contract renewal. When they met in mid-July, Sister Mary Margaret told Biel she was not renewing her contact and offered two reasons for her decision: Biel was not strict enough with her students, and it would be unfair to Biel's students "to have to have two teachers for the children during the next school year." III-ER.263-266, 272. Sister Mary Margaret later conceded that having two fifth-grade teachers in the same year would not have created any burden for the school. III-ER.475-476. Sister Mary Margaret admitted, and Biel's experience the year before confirmed, that when teachers went out on maternity leave, the school hired long-term substitutes for their classes. III-ER.476.

Biel sued the school. IV-ER.853-862 (Complaint). Biel's lawsuit alleges, *inter alia*, that the school's failure to renew her teaching contract constituted discrimination on the basis of disability, retaliation for having engaged in protected activity, and failure to accommodate her disability, all in violation of the ADA. IV-ER.856-858.

## B.   District Court's Decision

The district court granted the school's motion for summary judgment on the ground that the school "established a *prima facie* case [that] Biel was a minister

6

within the meaning of the ministerial exception" and "Biel did not raise a triable issue of fact" that would preclude granting summary judgment based on the exception. Amended Order (I-ER.1-6). The court purported to base this ruling on the Supreme Court's decision in *Hosanna-Tabor*, 565 U.S. 171 (2012). *See* I-ER.3-5. Although the school also argued that Biel could not establish pretext, the court did not reach that question.

After summarizing selected portions of the Supreme Court's decision, I-ER.4, the court acknowledged that Biel's case "does not contain all the hallmarks of ministry identified in *Hosanna-Tabor*." I-ER.5. The court nevertheless ruled that Biel was a "minister" because her "'job duties reflected a role in conveying the [Catholic] Church's message and carrying out its mission.'" I-ER.4 (quoting *Hosanna-Tabor*, 565 U.S. at 192). The court noted that—like the *Hosanna-Tabor* complainant—Biel taught her students religion four times a week and prayed with them each day. I-ER.4-5. The court also noted that Biel "sought to carry out St. James's Catholic mission" by "including Catholic teachings into all of her lessons and attending a conference to learn techniques for incorporating religious teachings into her lessons." I-ER.5. Based on these undisputed facts, the court determined as a matter of law that the ministerial exception applied to Biel's claim and granted summary judgment. *Id.*

7

# **ARGUMENT**

**The district court erred in ruling that Biel, as a fifth-grade teacher in a Catholic school, was a "minister" of the Catholic church and, as such, barred by the ministerial exception from pursuing her disability discrimination claims against the school.**

This appeal offers this Court an opportunity to clarify the balance between two important sets of legal protections. On the one hand, the First Amendment's guarantees of religious freedom (both the Free Exercise Clause and the Establishment Clause) protect religious institutions from government interference with their choice of ecclesiastical leaders. *Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1100-02 (9th Cir. 2004) (recognizing the First Amendment protects a religious institution's "unfettered freedom in its choice of clergy"). On the other hand, congressionally enacted civil rights laws, including the ADA, require these same religious institutions, like other employers, to refrain from discriminating against their employees based on disability and other protected traits such as race and sex. *See, e.g.*, *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1365-70 (9th Cir. 1986) (concluding that "Congress has clearly expressed the intention that Title VII apply" to female employee's claim that her employer—a religious school—denied her health benefits based on her sex); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (holding that

8

Congress intended Title VII to regulate employment relationship between Baptist liberal arts college and its faculty and staff).[3]

The district court here attempted to strike a balance between Biel's claim that the school's failure to renew her teaching contract constituted unlawful disability discrimination and the school's claim that Biel should be considered "clergy" and, therefore, that the school is exempt from having to defend its decision not to retain her. In so doing, however, the court misapplied the relevant legal precedent and struck the wrong balance. The decision should be reversed.

As a general rule, the ADA forbids employers—including religious institutions—from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *see* 42 U.S.C. § 12111(5)(B) (exempting certain employers—but not religious institutions—from ADA's prohibitions). Biel's lawsuit alleges that St. James School violated this statutory prohibition when the school principal declined to renew Biel's teaching contract shortly after Biel told

---

[3] Title VII contains a "narrow" exemption for religious institutions "with respect to the employment of individuals of a particular religion to perform work connected with … [the institution's] activities." *See Fremont Christian Sch.*, 781 F.2d at 1365-66 (quoting and discussing 42 U.S.C. § 2000e-1(a)). *See also* 42 U.S.C. § 2000e-2(e)(2) (specifying the circumstances under which it is not an unlawful employment practice for a religious educational institution to hire and employ employees of a particular religion). That employment decisions may be based on religious preferences does not exempt religious institutions from the other protections of employment discrimination laws, however. *Fremont Christian Sch.*, 781 F.2d at 1366-67. In any event, neither of these provisions is relevant here, where St. James did not maintain that it required teachers to be Catholic and, even if it did, Biel attested that she was Catholic at the time. III-ER.188-189, 222.

her she would need time off in a few weeks to begin treatments for her breast cancer.

To establish a prima facie case of ADA disability discrimination, Biel proffered evidence that she (1) was qualified for the job, (2) had a disability (breast cancer), and (3) suffered an adverse employment action after the school learned of the disability. *See Humphrey v. Mem. Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001). Faced with such prima facie evidence, a jury would be entitled to infer that the employer took the adverse action on the basis of disability unless the employer proffered a nondiscriminatory explanation that the plaintiff cannot show is pretextual. *See Dark v. Curry Cnty.*, 451 F.3d 1078, 1084-86 (9th Cir. 2006) (a reasonable jury could find defendant's proffered nondiscriminatory reason was a pretext for disability discrimination).

Here, the school did not dispute that Biel could make out a prima facie case, and it offered an explanation for failing to renew her contract—that she was not strict enough with her students and that, even though the school commonly hired long-term substitutes when teachers went on maternity leave, it would nevertheless be unfair for Biel's students to have two teachers the next year if she needed time off for cancer treatments. Thus, the question the district court would normally have addressed in deciding the school's motion for summary judgment was whether a reasonable jury could find that the school's stated reasons for not

10

renewing Biel's contract were actually a pretext for disability-based discrimination. *See id.*

But the district court never reached Biel's allegation of disability discrimination. Instead, the court ruled that Biel, in her role as a fifth-grade teacher at St. James, was a minister of the Catholic church. Applying the constitutionally-derived ministerial exception that the Supreme Court recognized in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), for employment discrimination claims against religious institutions, the district court dismissed Biel's disability discrimination claim against the school.

The district court erred. The Supreme Court, in *Hosanna-Tabor*, rested its application of the ministerial exception on the presence of multiple factors indicating the employee in that case was a minister. These factors are, for the most part, absent here. Although the district court recognized that "this case does not contain all of the hallmarks of ministry identified in *Hosanna-Tabor*," I-ER.5, the court failed to appreciate the significance of these missing considerations.

In *Hosanna-Tabor*, the Supreme Court ratified the unanimous view among federal courts of appeals that there exists "a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 565 U.S. at 188. The Court stated

11

that both religion clauses of the First Amendment "bar the government from interfering with the decision of a religious group to fire one of its ministers," *id.* at 181, explaining: "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* at 184.

The Court also noted that although it had addressed this First Amendment issue previously in other contexts, it had never before considered whether a religious organization's freedom to select its own ministers "is implicated by a suit alleging discrimination in employment." *Id.* at 188. In holding that it was, the Court explained: "The members of a religious group put their faith in the hands of their ministers," and allowing the government to have a role in "imposing an unwanted minister" through enforcement of employment discrimination statutes would interfere with "a religious group's right to shape its own faith and mission through its appointments." *Id.*

Turning to the case at hand, the Court acknowledged that the "ministerial exception is not limited to the head of a religious congregation." *Id.* at 190. But like this Court's prior decisions, the Supreme Court expressly declined to establish a "rigid formula" for deciding who qualifies as a minister for purposes of the exception. *Compare Hosanna-Tabor*, 565 U.S. at 190 (no "rigid formula"), *with Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1290 (9th

12

Cir. 2010) (en banc) (declining to adopt any particular test in finding a seminarian—as a minister-in-training—fell within the ministerial exception). Instead, the Supreme Court carefully examined the totality of the circumstances in *Hosanna-Tabor* and concluded that, given the particular circumstances of her employment, the exception covered Cheryl Perich, the parochial school teacher in that case. 565 U.S. at 190.

In reaching this decision, the Supreme Court identified four categories of factors that, considered together, led it to find Perich was a minister for purposes of the exception: "the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church." *Id.* at 192. The Court's discussion makes clear, however, that the first three factors were particularly critical to its decision.

Specifically, the Court first emphasized that the congregation that operated the Lutheran school where Perich worked gave her the formal title of "Minister of Religion, Commissioned," in contrast to the title of "lay" or "contract" teacher given to the teachers who had not been formally commissioned by the church as ministers. *Id.* at 191. And the Court noted that when the Hosanna-Tabor congregation extended Perich this title, it tasked her to "perform[] that office 'according to the Word of God and the confessional standards of the Evangelical Lutheran Church.'" *Id.* The congregation further "undertook to periodically

13

review Perich's 'skills of ministry' and 'ministerial responsibilities,' and to provide for her 'continuing education as a professional person in the ministry of the Gospel.'" *Id.*

Second, the Court considered significant "the substance reflected in that title." *Id.* The Court noted that Hosanna-Tabor gave Perich the title "Minister of Religion" only after she had undergone "a significant degree of religious training" that included eight college-level courses in religious subjects and took Perich six years to complete. Thereafter, Perich underwent "a formal process of commissioning" by her local church district that required her, among other things, to petition the church, to provide a personal statement and written answers to ministry-related questions, and to pass an oral examination by a faculty committee at a Lutheran college. Only after completing this lengthy and complex process did she receive the congregation's formal endorsement "recogniz[ing] God's call to her to teach." *Id.*; *see also id.* at 192-93 (noting lower court's error in attaching no "relevance" to Perich's title as a "commissioned minister," her "significant religious training," and the "recognized religious mission underl[ying] the description of [Perich's] position").

Third, as to Perich's use of the title, the Court stressed that "Perich held herself out as a minister of the Church" in several ways. As noted above, she expressly pursued the position, after which she accepted the church's "formal call

14

to religious service." *Id.* at 191. She also referred to herself as a minister in correspondence with the church, stating after her termination: "I feel that God is leading me to serve in the teaching ministry…. I am anxious to be in the teaching ministry again soon." *Id.* at 192. And she claimed a federal tax benefit reserved for persons "in the exercise of the ministry." *Id.* at 191-92.

Finally, the Court observed that Perich's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 192. Hosanna-Tabor had "expressly charged" Perich with "lead[ing] others toward Christian maturity" and "teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity as set forth in the symbolical books of the Evangelical Lutheran church." *Id.* (internal quotations and citation omitted). In fulfilling these responsibilities, Perich was required to lead students in prayer three times a day and to provide her students with forty-five minutes of religious instruction per day, four days per week. *Id.* She also accompanied her students to a weekly chapel service that Perich, herself, planned and led twice a year— "choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible." *Id.* at 192. And during her last year of teaching, Perich led her students in a short devotional exercise each morning. Given these religious functions, the Court stated, "Perich performed an important role in transmitting the Lutheran faith to the next generation." *Id.*

15

The Court faulted the lower court, in ruling Perich *not* a minister, for placing too much weight on the fact that Hosanna-Tabor's lay teachers—whom the school did not recognize as ministers—performed many of the same religious duties as "called" teachers like Perich. *Id.* at 193. Although agreeing that it was relevant that Hosanna-Tabor also required lay teachers to lead their students in prayers and teach religion, the Court reasoned that this factor could not be "dispositive," particularly given Hosanna-Tabor's position that non-ministers performed these religious tasks "only because commissioned ministers were unavailable." *Id.* The Court expressed no view on whether someone performing those job duties would fall within the ministerial exception absent the other considerations discussed. *Id.*

The Court also rejected an argument that the ministerial exception should not apply to Perich because her religious duties occupied a relatively small portion of her teaching day. *Id.* at 193. The Court considered "[t]he amount of time an employee spends on particular activities" to be "relevant" in assessing the employee's ministerial status, but said that factor could not be "considered in isolation" apart from "the nature of the religious functions performed" and the other considerations mentioned. *See id.* at 193-94. Taking into account all the factors discussed, the Court concluded that Perich was a minister within the meaning of the exception.

16

To date, this Court has applied *Hosanna-Tabor*'s guidance only once, albeit not in the context of an employment discrimination claim. *See Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017) (reviewing presence or absence of *Hosanna-Tabor* factors in assessing whether board members fell within ministerial exception). The plaintiffs in *Puri* sought "placement on the management boards of organizations associated with the Sikh Dharma religious community," a claim that would have to be dismissed if those positions were ministerial in nature. *Id.* at 1157. This Court reversed dismissal of the lawsuit because, using the *Hosanna-Tabor* factors as a guide, it was "not apparent on the face of the complaint that the disputed board positions are 'ministerial.'" *Id.* at 1160-62.

This Court found some significance in the fact that the organizations in question had a mission and purpose to advance and promote the teachings of the Sikh Dharma's religious leader and that all board members were required to be ordained ministers. *Id.* at 1160. The Court concluded, however, that any significance attached to those considerations was outweighed by the absence of the other *Hosanna-Tabor* factors. *Id.* at 1158-62 (also citing pre-*Hosanna-Tabor* Ninth Circuit case law). The Court explained, among other things, that board members—in their capacities as board members—were not held out as religious leaders. Moreover, board member status carried secular rather than religious titles ("manager" and "trustee"), secular responsibilities (to manage the corporation's

portfolio of for-profit and nonprofit holdings), and an absence of "ecclesiastical duties or privileges." *Id.* at 1160-61. Viewed as a whole, those factors convinced this Court that while board members were ministers in other contexts, they were not "ministers" for the purpose of determining whether the ministerial exception precluded the plaintiffs from pursuing their claims that they were entitled to seats on these governing boards.[4]

Consistent with *Hosanna-Tabor* and *Puri*, this Court should find that Biel was not a minister within the meaning of the ministerial exception. As in *Puri*, most of the factors the Supreme Court considered significant in *Hosanna-Tabor* are absent here. Unlike in *Hosanna-Tabor*, the school did not give Biel the title of minister; rather, her job carried the secular title of "Teacher" (specifically, "Grade 5 Teacher"). Neither St. James Catholic Church nor the Archdiocese of Los Angeles ever commissioned Biel as a minister in any kind of religious ceremony. Furthermore, Biel never held herself out to be a minister; she never referred to herself as a minister in correspondence with the school; and she never claimed a

---

[4] The Commission recognizes that one paragraph in *Puri* could be read to suggest that the ministerial exception might apply if any one of the four groups of factors the Supreme Court considered in *Hosanna-Tabor* (*i.e.*, the employee's title; the substance underlying the title; the employee's own use of the title; and the employee's performance of religious tasks) were satisfied. *See Puri*, 844 F.3d at 1160. In fact, however, any such conclusion would conflict not only with the Supreme Court's decision in *Hosanna-Tabor*, but also with how this Court applied *Hosanna-Tabor* in *Puri* in declining to dismiss the plaintiffs' complaint based on the ministerial exception. *See id.* at 1160-62.

federal tax benefit reserved for persons "in the exercise of the ministry." *Compare* facts discussed *supra* at pp.3-4 *with Hosanna-Tabor*, 565 U.S. at 191-92.

Moreover, Biel, unlike Perich, had no special religious training, before or after St. James hired her to teach fifth grade. She attested that the half-day conference the school required her and other St. James teachers to attend consisted of "education classes mostly." III-ER.232. And Biel indicated that the focus, in any event, was on teaching the participants educational techniques, including how to incorporate God into lesson plans as well as such non-religious topics as "how to do art." III-ER.232-233. Biel's training was, therefore, wholly unlike the religious training Perich underwent before Hosanna-Tabor commissioned her as a minister—eight college-level courses in religious doctrine that took Perich six years to complete. Furthermore, Biel did not have to submit a written statement of faith, answer ministry-related questions, or undergo an oral examination of her religious knowledge by college faculty, all of which the Hosanna-Tabor congregation required of Perich before formally commissioning her as a called Minister of Religion. *Hosanna-Tabor*, 565 U.S. at 191.

In finding Biel to be a minister, the district court ignored these many dissimilarities and focused only on the religious elements of Biel's job (stating her "job duties reflected a role in conveying the [Catholic] Church's message and carrying out its mission"). I-ER.4 (quoting *Hosanna-Tabor*, 565 U.S at 192). It is

19

true, as noted above, that the Supreme Court declined to decide whether a lay teacher like Biel would be covered by the ministerial exception based only on the fact that she was required to perform the type of religious functions that Perich performed. *Hosanna-Tabor*, 565 U.S. at 193. But even if that were enough by itself—and there is no reason to assume that it is—the district court overlooked the fact that Biel performed notably fewer religious functions than Perich did.

Like Perich, Biel taught religion to her fifth-grade students for about half an hour a day, four days per week. But unlike Perich, whom Hosanna-Tabor had charged with "teach[ing] faithfully the Word of God [and] the Sacred Scriptures" based on her religious training, *id.* at 192, Biel taught religion from a textbook that the school principal had selected and instructed her to use. Biel did not regularly "lead" her students in daily prayer (as Perich did three times per day). Rather, in Biel's classroom, daily prayers were led mostly by the students themselves. Biel never led Mass nor helped to plan it (unlike Perich, who planned and led chapel services twice a year, including delivering a short message based on verses from the Bible), and Biel never led her students in daily devotions (as Perich did during her last year of teaching). Biel escorted her students to Mass once a month, but her responsibility there was simply to ensure they stayed quiet and in their seats. *See* discussion *supra* at pp.3-4. At least under the circumstances of this case, these few

religious duties, standing alone, are not enough to warrant affixing the designation of minister on Biel and the other teachers at St. James.

This result makes sense under *Hosanna-Tabor*. If teaching religion to elementary school students for a half-hour each day, praying with them daily, and accompanying them to weekly or monthly religious services were sufficient to establish a teacher as a minister of the church within the meaning of the ministerial exception, the Supreme Court would have had no need for most of its discussion in *Hosanna-Tabor*. Rather than emphasize that it based its conclusion on all the factors mentioned in the decision, the Supreme Court could just have stated that teaching religion, leading students in prayer, and accompanying them to chapel were enough, and omitted the rest of its discussion.

In fact, the Court made clear in *Hosanna-Tabor* that context matters. Perich taught her students religion, led her students in prayer, and accompanied them to weekly chapel services within the larger context of her expressed belief that she had been "called" to this "ministry." Furthermore, in the formal "commissioning" service that Perich's church conducted, the congregation charged her to perform her office of "Minister of Religion, Commissioned" "according to the Word of God and the confessional standards of the Evangelical Lutheran Church," and the congregation expressed its intention to review periodically her "skills of ministry" and "ministerial responsibilities." *Hosanna-Tabor*, 565 U.S. at 191. The Supreme

21

Court's decision spells out the details of the rigorous process by which Perich acquired the formal title of "minister" and the significant religious responsibilities that accompanied the title. *Id.* It was against this backdrop that the Supreme Court considered the religious functions Perich performed with her students as additional factors confirming her ministerial status.

Thus, the fact that the Supreme Court in *Hosanna-Tabor* relied on far more than Perich's duty to teach a daily religion class, pray with her students, and accompany them to weekly chapel services strongly suggests that those religious duties, without more, do not render an elementary school teacher like Biel a minister so as to exclude her from the protections of the ADA and other federal employment discrimination laws.

That the school required Biel (and the school's other teachers) to "infuse Catholic values into all subject areas" and to serve as role models does not change the analysis and make Biel (and all her teaching colleagues) ministers within the meaning of the ministerial exception. As the Fifth Circuit stated in ruling that secular faculty at a religious college did not fall within the ministerial exception (language this Court thereafter quoted with approval), the fact that "faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." *Mississippi Coll.*,

22

626 F.2d at 485 (*quoted in EEOC v. Pac. Press Publ'g*, 676 F.2d 1272, 1274, 1278 (9th Cir. 1982)).[5]

Nor does requiring a teacher to integrate religious values into the general curriculum, without the other considerations the Supreme Court found relevant in *Hosanna-Tabor*, make lay teachers ministers of the church. *See Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132 (D. Or. 2017) (professor of exercise science at religious university not a minister and therefore not barred from pursuing her Title VII claims of pregnancy and sex discrimination). As the court in *Richardson* explained after noting the complete absence of the first three groups of *Hosanna-Tabor* factors, although Richardson was required "to integrate her Christianity into her teaching and [to] demonstrate a maturing Christian faith," those functions were "wholly secondary to her secular role." *Id.* at 1145. These religious functions, the court stated, were insufficient to establish Richardson as a "minister." *Id.* Indeed, the court explained: "If plaintiff was a minister, it is hard to see how any teacher at a religious school would fall outside the exception. Courts have properly rejected such a broad reading of *Hosanna-Tabor*, which would permit the ministerial exception to swallow the rule that religious employers must follow federal and state employment laws." *Id.* at 1145-46 (citation omitted).

---

[5] *EEOC v. Pacific Press Publishing* was abrogated on other grounds. *See Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991).

Since *Hosanna-Tabor* was decided, courts have applied the ministerial exception to individuals who performed a leadership role in guiding the spiritual direction of a church, its religious services, or a parochial school. *See, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 205-09 (2d Cir. 2017) (Catholic school principal's Title VII claims barred because she was a minister within meaning of ministerial exception); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177-78 (5th Cir. 2012) (Catholic church music director's discrimination claims barred by ministerial exception because of important role music plays in Catholic church's celebration of Mass).

But where an employee's religious duties did not involve a spiritual leadership role, courts both pre- and post-*Hosanna-Tabor* have declined to apply the ministerial exception to bar statutory discrimination claims. In *Sterlinski v. Catholic Bishop of Chicago*, 2017 WL 1550186 (N.D. Ill. May 1, 2017), for example, the district court applied the ministerial exception and dismissed the plaintiff's claim that his demotion from his position as the church's Director of Music was discriminatory. The court reasoned that, when Sterlinski was Director of Music, he not only performed religious music, but also helped to plan and lead religious events. *Id.* at *3-4. The court declined, however, to dismiss Sterlinski's claim of discriminatory termination based on his subsequent discharge from the church organist position he held after his demotion. *Id.* at *4-5. The court

24

explained that discovery was needed to determine whether Sterlinski remained a minister even after his demotion or whether, at that point, he was merely a musician who played for religious services under a minister's direction. *Id.* at *4-5.

Applying similar reasoning to a parochial school context, the court in *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, ruled that a Catholic junior high school language arts teacher was not a minister, even though she was expected "to provide students with an example of how to live their faith [and] to share her devotion to God whenever she could." 48 F. Supp. 3d 1168, 1176-77 (N.D. Ind. 2014). The court concluded that the teacher's specific religious duties, involving "her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity," in no way compared to Perich's situation. *Id.* at 1177. The court further explained: "Labelling [a parochial school teacher] a 'minister'" based on the type of religious duties Herx performed would not only "greatly expand the scope of the ministerial exception" beyond what the Supreme Court intended, but "ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the *Hosanna-Tabor* Court." *Id.*

Other courts have reached the same result in similar circumstances. *See, e.g.*, *Bohnert v. The Roman Catholic Archbishop of San Francisco*, 136 F. Supp. 3d 1094, 1113-15 (N.D. Cal. 2015) (declining to apply ministerial exception to

Catholic high school teacher's Title VII claim where most *Hosanna-Tabor* factors were absent and plaintiff's role in Campus Ministry programs "was not to provide spiritual or religious guidance" but to assist with logistics and help facilitate programs); *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (ministerial exception did not apply to facilities manager at a Jewish synagogue with no religious duties other than minimal responsibilities to instruct students about religious symbols); *Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 221 (E.D.N.Y. 2006), *adhered to after reconsideration*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008) (ministerial exception did not apply to fifth-grade teacher who taught one hour of Bible study per day and attended religious ceremonies with students once per year).

As these decisions illustrate, the fact that St. James assigned Biel—and its other elementary school teachers—a role in facilitating or supervising religious activities in the classroom and infusing Catholic values into their ordinary teaching duties does not warrant classifying these teachers as a "ministers." At least on these facts, the district court erred in ruling on summary judgment that the ministerial exception applied to Biel.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment and remand this matter for further proceedings.

Respectfully submitted,

JAMES L. LEE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

BARBARA L. SLOAN
Acting Assistant General Counsel

s/Susan R. Oxford
SUSAN R. OXFORD
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4791
susan.oxford@eeoc.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,089 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

<u>s/   Susan R. Oxford</u>
SUSAN R. OXFORD
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4791

Dated:  September 27, 2017

## **CERTIFICATE OF SERVICE**

I, Susan R. Oxford, hereby certify that I electronically filed the foregoing brief with the Court via the appellate CM/ECF system this 27th day of September, 2017. I further certify that, upon notification from the Clerk's Office that the brief has been accepted, I will file seven (7) copies of the foregoing brief with the Court by commercial delivery, postage pre-paid. I also certify that all counsel of record are registered CM/ECF users of this Court and that service will be accomplished by the appellate CM/ECF system on September 27, 2017.

s/Susan R. Oxford
SUSAN R. OXFORD
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4791